Good morning, and may it please the Court, Brian Pepicelli on behalf of the Boilermaker-Blacksmith National Pension Trust and its fiduciary, John Foltz. This case originates from two partial withdrawal liability assessments. One was based on a 70 percent decline in contribution-based units, which are just hours. The other is based on GE's decision to terminate its shop boilermakers at its Chattanooga facility and then subsequent transfer of the work to other GE-owned or operated facilities in China and Mexico. The merits of those assessments are not at issue in this appeal. Instead, the question is whether GE can avoid liability for those assessments on the basis that it is a building and construction industry employer. That turns on how we should be counting GE's employees for purposes of the statute's substantially all test. If I could just provide a little bit of context to put this issue, to say what this dispute is about and what it isn't. The fund receives contributions from around 450 to 500 employers every year. This dispute, this headcount issue, it really only affects about 6 percent of those employers, the ones who are mixed, the ones who contribute for both shop employees and field employees. Even then, it's narrower because it only affects those mixed employers that do something to trigger withdrawal liability in the first place. That is why we are here. It is not because the fund is trying to eviscerate or eliminate this exemption from the law. It is simply because GE is within that small group, a mixed employer that did something to trigger partial withdrawal liability. Just with respect to GE's field and shop employees, there are some notable differences between them. The shop employees are not construction workers. They're permanent. They work for the same employers throughout their career. When one of their employers withdraws from the fund, that has a direct and permanent impact on the fund's contribution base. The other group of employees, the field employees, they are construction workers. They tend to hop around from employer to employer. They have less trouble finding work from other contributing employers after a withdrawal. The fundamental question in this case is how to count those two groups of employees for purposes of the substantially all test. On that issue, the statute provides no guidance as to the appropriate headcount method to be applied. It does not prohibit the monthly headcount standard. It does not require an aggregate standard. This is in contrast to other bright line calculational provisions that are in ERISA and MEPA. We think that that lack of guidance, as the district court concluded, renders the statute ambiguous. Because it's ambiguous, that calls for an analysis of whether this situation would further the statute's purpose of protecting the fund's contribution base. Under that analysis, we believe that as a matter of law and based on the facts of this particular case, a monthly headcount standard is appropriate. Wouldn't an hourly or I guess maybe a CBU unit, wouldn't that be more accurate to reflect what you're trying to get at here in determining the liability? We do not have an hourly headcount data, GE reported. The closest we can ever get is monthly. Is that why you're not pushing for the hourly headcount? Because you don't have that data? Is that not accessible in some fashion? It is not. The arbitrator misunderstood that we had that data. He says that in his award, but as Actuary Redmond's report makes clear, that data is not available. He also notes that because he couldn't analyze it, there could be other problems with it, such as time differences. If people are working during the night shift and there aren't any other people working, that could skew it one way or another. That could invite potential sources of data or bias. It's not just a total number of hours issue that they're contributing to the plan for? In other words, don't they contribute more for an employee who has worked four hours than two hours or eight hours than six? Sure. Contribution-based units, those are the hours for which contributions are made. The monthly standard, in this case, does go in tandem with that CBU analysis, but it wouldn't necessarily always go in that. We point out in our brief that we think that that is an appropriate ... CBUs are not dispositive, but we think they can be relevant to answering this question of how to resolve this ambiguous statute, because they do suggest whether or not the fund's contribution base has been harmed. Are you arguing for the monthly snapshot as a rule across the board, or are you just saying in this particular case, it's the monthly snapshot, and if it's the latter, why? Is it anything more than that's what GE is ... that's their monthly contribution requirement? We are not arguing for a categorical rule from this court that it must be applied in all situations. There may be factual circumstances in which it doesn't make sense, but we are arguing for it on the facts of this case, because it is consistent with just how GE's ... the reality of GE's operations during the period. And the problem is, is that the aggregate headcount method that GE is advocating for, it shows 97% field employees, even though it never came anywhere close to achieving that field percentage during the periods in which it was submitting the contributions to the fund. Because of the seasonality of their business, right? No, the seasonality did not affect their inability to satisfy the monthly headcount standard. That claim was analyzed by the fund's experts in their rebuttal reports. Let me ask this question. They're presenting an aggregate analysis. You're presenting a monthly analysis. Is it fair to say that no one is arguing for anything? Those are the only two choices this court has. Possibly, GE might, as a fallback, be arguing for an annual standard, even though their primary argument is that we can't be considering anything other than aggregated data. But they ... Did they argue that in their brief? They allude to it. I'm not sure if they expressly argued it. Okay. Because in other cases, I think a Seventh Circuit case, if I recall right, they stipulate to CBUs. Right. We couldn't reach an agreement in this case, right? Correct. And if we did use CBUs, as we point out in our brief, GE would not be entitled to the exemption. But we do agree that because the statute refers to employees, there has to be some sort of headcount. But we think that the headcount method, it kind of aligns with the contribution-based units. Yeah. I kind of agree with what you're saying. CBUs don't align with employees as used in the statute. So that doesn't seem like the right answer. So why is your monthly a better ... It's certainly more complicated. It's less elegant than the aggregate. Why is yours, other than the fact that you win, why is it a better way to do it? Well, if I may refer the court to the table, it's at Appendix 253. It's this table right here. And it shows exactly what GE's operations look like throughout the period. And so that helps us ... You asked about seasonality. We can see from this table that seasonality did not impact GE's ability to qualify. I mean, the reason it did not qualify is, as Professor Pegdon indicated in his rebuttal report, GE did not have enough field work during the determination period because it had too much of that non-construction shop work. And the shop work is what really harms the fund's contribution base. Because as I said in the beginning, when those employers withdraw from the fund and terminate those employees, they can't go get work from other contributing employers to the fund. And so, as the Seventh Circuit said in the Robinson-Cartage case, and as the district court decision in that case below indicates, we should not be ignoring the conduct with respect to the non-construction operations. We have to account for it because the exemptions rationale does not extend to that type of steady manufacturing work. And maybe I'm asking the same question, but why does the monthly snapshot reflect that better than another snapshot? And I understand we've got two options here, but why is that the best one here, putting aside the monthly obligations of GE? Because the monthly standard actually makes it look like it reflects how GE's operations were occurring during the period. If you look at this chart, nowhere in here is there 97 percent field employees, except for the one month when the shop just happened to be closed. That is an anomalous month. But otherwise, GE never came anywhere close to looking like an employer with 97 percent field employees. And if we go back a few pages. And on a monthly basis, but if you look at it on a yearly basis or an aggregate basis, they do. They do get there. They would, yes. And so it's about how to count the heads based on these differences. Has any – go ahead. I just keep struggling with the idea that if we adopt your approach, that what you're doing is you're failing to take into account the transitory nature of the construction employees and their general employability. And it's just not meeting what the Congress said that they wanted to protect in creating this provision. It's not that we're failing to – we're not trying to remove the transient nature of the field employees. What we're trying to do is make sure that the field employees aren't treated much more favorably than the shop employees. GE contributed for two sets of distinct employees. And so this aggregate head count method, it shows that even as GE's numbers declined by almost 700 employees from November 2007 to December 2007, the field numbers still went up by 268 employees. So even as the construction work goes down, the aggregate numbers go up. It does not track the underlying data, which all of the funds – this comes from GE's own remittance reports that it submitted. We're just simply saying that it makes sense to look at the reports that it submitted and determine based on that whether or not it can qualify. Two quick questions. Has any court ever approved your monthly analysis? No. So we – it was an issue in the PSF case and we – that case was remanded to the arbitration. We asked for permission to appeal it to this court and that was denied. So it never – and then the district court here followed that decision. And I assume since there were none cited that there's no Department of Labor or PCMB regulations on this? Correct. Too bad. Okay. Yeah. So I'd like to reserve my remaining time. Thank you. Thank you.  Very well. Good morning, Your Honors. And may it please the Court. Evan Miller from Jones Day for Apelli General Electric. The issue in this appeal is a narrow one. The parties agree that the phrase, substantially all employees, means 85%. They also agree that the time period for assessing whether the 85% threshold is satisfied is eight years. The only dispute is whether one counts employees in the aggregate or under the fund's indeterminate, convoluted, monthly snapshot approach. So in response to your prior question, I was going to ask another. Yes. Well, we think it's a, this case is a very narrow one of either or. We note for the record again that if. Wait a minute. Just to be clear. Our choice is between your aggregate and their monthly, and that's it. That's it. Okay. We note for the record that GE would also satisfy an annual counting method, but that is not. You're not arguing for that. Not arguing for that, and neither is the appellant. So why is your aggregate method better than their monthly? Why does it reflect whether substantially all employees are in the building construction industry? Yes. And I'll respond by referencing Judge Erickson's observation that the monthly snapshot test does not take into account, and in fact works against the primary feature and purpose of the building and construction industry exemption, which is to protect construction industry employers from the ebbs and flows of the construction business and necessarily as a consequence a fluctuating and transient workforce. Indeed.  In this particular situation, it seems like you've got a little bit different set of facts and that, as I understand it, the parties agree that the boilermaker industry, that is in decline. So instead of the sort of typical construction worker pool that Congress was thinking about, that they go on a project, that project's complete, you move on to the next, and so they're still contributing to the plan in some fashion or their employers are. This is an industry, as I'm understanding it, and correct me if I misunderstand the party's view on this, but it's a declining industry. So the boilermakers, maybe you don't use them, but then you may not be using them more because there's just no more jobs. So they're not going from project to project like the typical construction worker. Does that factor in when we look at this ambiguous statute, this ambiguous term, and should we be considering that intent of Congress in determining how to, what the snapshot is? Well, let me respond first by addressing the issue of whether the language here in 1383B is ambiguous. It is our position that it is not ambiguous, that given the narrow issue before the Court, the aggregate approach flows naturally and without complication from the text of 1383B. Even despite the present tense, the use of the present tense? That, yes. Doesn't that seem to suggest that you just would look at current employees? Well, first, as an initial matter, the use of the present tense certainly does not support the funds reading. There's nothing about the use of the present tense that suggests that Congress contemplated a complex calculation. Well, I won't argue with that, but I think we were talking about whether it's ambiguous or not. Right. And we think that the present tense is, as you say, potentially relevant only to determine the period for counting. And here the parties agree that the appropriate period is 8 years. And frankly, the 8-year period finds direct support in the statutory text. 29 U.S.C. 1385B1 states that a partial withdrawal is determined by looking at contribution history over an 8-year period. So putting the pieces together, the statute, or in this case 1383B1, asks for a single count of employees for which the employer has an obligation to contribute during the relevant 8-year period. Setting aside ambiguity, maybe can you respond to Judge Kelly's question? Yes, and I wanted to get back to your question, Judge. So first, as it relates to the Boilermaker industry itself, the record clearly indicates that consistent with Congress's purpose, the construction employees who worked for GE also did work significant hours, in fact, substantially greater hours, for other contributing employers. So do you disagree then that it's a declining? So you disagree with the basic premise that it's a declining industry? Well, it may be declining, but the key issue is that Congress's recognition that the construction industry needs a special rule and an exemption from the normal rules because construction employers have a transient workforce, and when that workforce, given the available work, is not working for a particular construction company, it's likely to be working on other companies' projects. That holds here, absolutely. Moreover, I would observe that the issue before the court, the statutory interpretation issue before the court, is, of course, not limited to the Boilermaker industry. It is a construction industry exemption more broadly, and there is no reason and certainly no statutory text that would suggest a different rule for different crafts within the industry. Following up on the text, do you have an understanding of why Congress used employee for this exemption and yet relied on CBUs elsewhere to do calculations for withdrawal liability? Yes, and I very much want to address this CBU issue because it is Gee's strong view that the notion that contribution base units should be some, as the appellant put it, guiding star or useful check on the legitimacy of their monthly counting method is, in our view, absolutely incorrect. That the focusing on contribution base units or hours, we believe, is sort of a false beacon. It is precisely what the court should metaphorically run away from, and let me expand on why that is the case. Because a construction employer's workforce is necessarily transient and fluctuating, for example, a construction company may be without projects, any projects, for some periods of time, and the volume of projects for construction companies may fluctuate greatly from year to year and over years. There will be numerous specific moments in time, specific days, weeks, months, or hours, contribution base units, in which the construction employee ratios of mixed employers will fall below 85%, and any method that examines short intervals, and the shortest interval is hours, will punish the mixed construction employer for those specific periods of time where the company employs fewer construction workers, even if its construction business actually dominates over its shop work over the long term. Is there any legislative history to the extent it's insightful as to is that the reason why they used employee in the exemption? Or is there anything out there? Using employee in the exemption is very much consistent with that particular objective, and indeed the funds So then why use the CBU elsewhere, I guess? And that is my point. Congress, or an additional point. The additional point, Your Honor, is Congress expressly chose in 1383b1 not to say substantially all contribution base units, while it specifically used contribution You could kind of say substantially all because you could have a number on that, right? It used substantially all employees rather than substantially all contribution base units, and it did use contribution base units, for example, in connection with the exemptive rules for the food industry. That's 1385. And it did use the phrase substantially all contributions, which is a similar phrase to substantially all contribution base units, in 1383d. And we think that the fact that Congress expressly chose to eschew use of substantially all contribution base units in 1383b1 was indeed quite intentional in recognition of the logic that if you're going to use a very narrow interval as the way to measure whether the exemption should apply, it necessarily, as we say in our brief, acts as a bug because it's designed to make the very qualifying feature of the exemption, which is the transient nature of the workforce, disqualifying. And so, Counselor, there is something out there that I think we haven't addressed, and I'd like to hear your thoughts, is that even with all of that, accepting that congressional structure, isn't this sort of ripe for manipulation? And I'm not suggesting anyone is doing that in any particular moment, but it seems to me that if you do the eight-year snapshot, there's a lot of room for business decisions to be made that would, knowing about the potential withdrawal liability, could be made to avoid having to pay that. We think that there are real checks with teeth in the withdrawal liability statutory scheme. And since you don't have much time, I'd like to sort of shortchange you there, because I'd just like to see if there's something other than that, the one where you're doing it with the intention. The evasion of liability. Yeah, because I think that there are plenty of business decisions that one could make that would have dual purpose, right, dual reasons. Like, we want to move some business assets around, and this is a benefit. Which one is the primary one, I don't know. But putting aside that limited statutory prohibition, are there other safeguards or other reasons why we shouldn't be concerned about manipulation of the business structure? Yes. The exemption is also only available to employers, construction employers, who participate in pension plans that must primarily cover construction employees. So, as an example, if an employer that operates unionized restaurants and contributes to a restaurant worker's pension plan, that employer could not start constructing restaurants in the last year of the eight-year look-back period in order to shield its restaurant workers from normal withdrawal rules, because those restaurant workers would not be in a construction industry plan in the first place. I would also, in response to your observations about the so-called evade or avoid rule, point out, Judge Kelly, that the statutory language in that rule is drafted rather broadly. It applies and covers any transaction, including in our situation, a fraudulent bid on a construction project that has any principal purpose, not the principal purpose, any principal purpose, to avoid withdrawal liability. So, in sum, and in closing, I will quickly say that we believe this Court should follow where text, clear statutory purpose, public policy, and existing case law all lead and affirm the decision below and enforce the arbitrator's award. Thank you, Mr. Miller.  Rebuttal? So, based on Mr. Miller's argument, I heard nothing indicating that the aggregate count that they are pushing for in this case actually reflects what their operations appeared like throughout the determination periods, those 96-month determination periods. And, yes, the boilermaker industry is in decline. Actuary Redmond's report addresses that. Since 2008, there has been a permanent decline. GE's expert, Stephen Lindauer, his report goes into that as well, because there has been a policy shift, a national and global shift, from coal-fired power plants to cleaner energy sources, and that requires less field boilermakers to construct, and it also requires less of them to maintain. And then so we actually provided a table on the last page of our reply brief. It's in the footnote. And this shows hypothetically, because we just heard a lot of hypotheticals, that there was, in fact, a 70 percent decline based on GE's field employees, even when accounting for all of the contributions that were received by other contributing employers. This is a shrinking industry. And at 29 U.S.C. 1001 little a, subparagraph A4, Congress specifically made a finding. This isn't in the legislative history. It's a finding that in a declining industry, the withdrawals from employers had a particularly severe impact on the fund's contribution base and increased the funding obligations for all the remaining contributing employers. And so with this ambiguous statute, we would ask to keep that in mind when also focusing on the fact that GE independently caused harm to the fund's contribution base with respect to its separate line of non-construction industry operations. There is no legislative history on why Congress chose the words employees here and used CBUs elsewhere. But I would note that the shop employees in this case, they worked 10 times as many hours as the field employees did, and they accounted for 20 percent of GE's overall operations throughout the determination periods. And so we are simply saying that that aggregate headcount method that GE has taken its entire case on now, it just confirmed that. That is not reflective of GE's overall operations. At no point did GE ever have just 3 percent shop employees. The aggregate standard makes the shop operations appear as though they are meaningless, and they clearly were not in this case. And so we would ask the court to reverse the district court, vacate the arbitration award, and remand this case for further proceedings. Thank you. The court appreciates both counsel's appearance and arguments. The case is submitted, and you may be excused.